*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CM-0334

G.W., APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CMDSLD-000293)

(Hon. Judith Bartnoff, Trial Judge)
(Hon. Steven M. Wellner, Trial Judge)

(Argued February 6, 2024     Decided September 26, 2024)

*Adrian E. Madsen* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Kristian Hinson*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

EASTERLY, *Associate Judge*: G.W. was convicted of simple assault in 2019 based on allegations that he grabbed the jacket of a Metropolitan Transit Police Department ("MTPD") officer outside the Anacostia Metro Station. After G.W.

filed a notice of appeal but before his case was briefed, we remanded to allow the trial court to set his conviction aside under the Youth Rehabilitation Act ("YRA"). Following the trial court's set-aside order and issuance of a new judgment and commitment order memorializing the YRA set-aside disposition, G.W. returned to this court after filing a new notice of appeal. G.W. now challenges his conviction, contending that (1) the trial court did not apply the elements of an offensive touching assault as defined in *Perez Hernandez v. United States*, 286 A.3d 990, 1004 (D.C. 2022) (en banc), and (2) the trial court erred by failing to sanction the government for discovery violations committed under Super. Ct. Crim. R. 16. The government disagrees with both contentions, which it asserts are unpreserved, but preliminarily argues that we need not reach the merits of G.W.'s claims because he lacks standing to appeal from the orders setting aside his conviction under the YRA.

We conclude that G.W.'s appeal is properly before us and that remand is required to allow the trial judge to consider two of the elements of an offensive touching assault, as defined in *Perez Hernandez*: whether G.W.'s actions would offend a person's reasonable sense of personal dignity and whether G.W. acted either with the purpose of causing offense or knowing that his actions would cause offense. In light of our decision to remand, we need not reach his Rule 16 claim.

## I.  The Propriety of This Appeal

### A.  Additional Background

After the trial court (Hon. Judith Bartnoff) convicted G.W. of simple assault on April 22, 2019, G.W. timely filed a notice of appeal.  Before the record was complete, in July 2019, G.W. moved to stay briefing, pending the outcome of this court's en banc decision in *Perez Hernandez*, 286 A.3d 990 (addressing whether a nonviolent offensive touching may constitute a simple assault and, if so, what elements the government must prove).[1]  Following our decision in *Perez Hernandez*, this court lifted the stay in G.W.'s appeal and issued a briefing order in February 2023.  Also in February 2023, G.W. asked the trial court for an indicative ruling that it would set G.W.'s conviction aside under the YRA, D.C. Code § 24-906(e), if the Court of Appeals were to remand G.W.'s case.  Following the process set forth in Super. Ct. Crim. R. 37(a) ("[i]f a timely motion is made for relief

---

[1] In December 2019, the trial court (Hon. James Crowell) purported to issue an amended judgment and commitment order extending G.W.'s term of probation so that he could complete a community service requirement.  And again in December 2020, the trial court (Hon. Steven Wellner) issued an order purporting to set aside G.W.'s conviction under the YRA.  But because G.W.'s appeal was still pending the Superior Court did not have jurisdiction to issue either of these orders.  *See Bell v. United States*, 676 A.2d 37, 40-41 (D.C. 1996) (explaining that "[a]s a general rule, once a notice of appeal had been filed, the trial court loses the power to take any substantive action with respect to the order or judgment on appeal").

that the court lacks authority to grant because of an appeal that has been docketed and is pending"), the trial court issued an indicative set-aside order. And in March 2023 G.W. filed an unopposed motion pursuant to D.C. App. R. 4(e)—which at that time was designated D.C. App. R. 4(f)[2]—to remand his case to the Superior Court, with the intent of "reinstat[ing] his direct appeal" following the issuance of a set-aside order. This court granted G.W.'s motion and remanded the case "to the Superior Court for further proceedings consistent with the statements made in appellant's motion."

On remand, the trial court issued a March 23, 2023 order setting aside G.W.'s conviction under the YRA, D.C. Code § 24-906(e-1).[3] The court also issued an amended judgment and commitment order memorializing the YRA set-aside, which the court dated nunc pro tunc to the date of G.W.'s initial judgment and commitment

---

[2] D.C. App. R. 4(e) (2023) states: "When a case is pending in this court, and the Superior Court has indicated its intention to grant a motion that will alter or amend the order, decision, judgment, or sentence that is the subject of the appeal," a party "may request a remand of the case for that purpose by filing in this court a motion to remand the case stating the trial judge's intention."

[3] The court cited to D.C. Code § 24-906(e), which authorizes the court to "discharge [a] youth offender . . . before the end of the maximum period of probation previously fixed by the court" and set aside the young person's conviction. But, as G.W. had completed his probation at the time of the court's set-aside order, we assume the court intended to set aside his conviction pursuant to D.C. Code § 24-906(e-1), which authorizes the court to set aside a young person's conviction "after the completion of the youth offender's probation or sentence of incarceration."

order in April 2019.[4] On April 20, 2023, G.W. filed a new notice of appeal from the amended judgment and commitment order, challenging his underlying conviction.

## B. Analysis

The government argues that G.W.'s appeal seeking to challenge the legitimacy of his assault conviction is not properly before this court. We understand the government to argue that G.W.'s present appeal of his April 2019 judgment and commitment order is untimely; he cannot use the 2023 set-aside order or amended judgment and commitment order as vehicles to reinstate his 2019 appeal; and neither of the 2023 orders are themselves appealable. None of these arguments are persuasive.

Timeliness under D.C. App. R. 4(b)(1) (requiring a notice of appeal in a criminal case to be filed within thirty days after entry of judgment) is not an issue here. G.W. filed notices of appeal from both the April 2019 judgment and commitment order and the March 2023 amended judgment and commitment order

---

[4] The court issued its separate order granting the YRA set-aside nunc pro tunc to the date of its unauthorized December 2020 order, *see supra* note 1. It is not clear from the record why the YRA set-aside order and the amended judgment and commitment orders were issued nunc pro tunc on different dates, and, in the absence of a challenge by the parties, we construe the April 2019 date in the 2023 amended judgment and commitment order as the operative one.

within the requisite thirty days.

Nor is reinstatement. By seeking a case remand from this court pursuant to D.C. App. R. 4(e), G.W. terminated the appeal of his April 2019 judgment and commitment order. *Bell v. United States*, 676 A.2d 37, 41 (D.C. 1996) (explaining that a "case" remand terminates an appeal and "[t]his court retains no jurisdiction over the case"). In addition, after obtaining a remand to the trial court, G.W. received both a set-aside order and a new judgment memorializing the YRA set-aside, which superseded the 2019 judgment and commitment order. *Cf. Long v. United States*, 163 A.3d 777, 785 & 788 n.22 (D.C. 2017) (explaining, in the context of habeas review, that a new judgment and commitment order supersedes a prior order because each order of judgment includes "both the adjudication of guilt and the sentence"). Simply stated, G.W. could not reinstate the appeal from his April 2019 judgment and commitment order because that order no longer dictated the outcome of his case.

Instead, the order that dictated the final outcome of G.W.'s case was the March 2023 amended judgment and commitment order (which incorporated the 2023 set-aside order). And, as we explained in *Bell*, "[i]f, after a case remand, a party is dissatisfied with the action of the trial court, the only course available to obtain review in this court[] is to file a new notice of appeal, once a final order or

judgment is entered." 676 A.2d at 41; *see also* D.C. Code § 11-721(a)(1) (granting this court jurisdiction over "all final orders and judgments of the Superior Court of the District of Columbia"); D.C. App. R. 41(e) (explaining that, following a case remand, a party must file a "new notice of appeal . . . if a party seeks review of the proceedings conducted on remand"). G.W. did just that.

The government argues, however, that G.W. could not seek an appeal from either the 2023 set-aside order or the March 2023 amended judgment and commitment order because he lacks standing to appeal the former order—which the government asserts did not aggrieve him because the order gave him "the precise relief he requested"—and because the latter order was not in fact a new judgment, but was merely an amendment of the April 2019 judgment and commitment order. G.W. did not include the 2023 set-aside order in his notice of appeal; he appealed from the March 2023 judgment and commitment order which expressly incorporated and reaffirmed the set-aside order.[5] So the real question is: does G.W. have standing

---

[5] The government argues that the YRA statute only authorizes the Superior Court to "issue[] a certificate" communicating the grant of the set-aside, D.C. Code § 24-906(e-2), and suggests that the issuance of a new judgment and commitment order is impermissible. We acknowledge that the statute directs that when a "youth offender's conviction is set aside, [they] shall be issued a certificate to that effect" but see nothing in the statute that precludes the issuance of a new judgment and commitment order. Moreover, we think the issuance of a new judgment and commitment order that incorporates a set-aside order—like the order on appeal in

to challenge the March 2023 amended judgment and commitment order—or more specifically, was that order a new order that aggrieved him? The answer to both of these questions is yes.

A YRA "set-aside" is something of a misnomer. It is premised on an adjudication of guilt and the imposition of a sentence, *see* D.C. Code § 24-906(a)-(e-1), and, if granted, results in a "set[-]aside" conviction that still has defined consequences and does not give the youth offender a clean slate. *Solomon v. United States*, 120 A.3d 618, 622 (D.C. 2015) (explaining that a "set-aside [under the YRA] does not amount to an acquittal . . . ; it merely shields [a conviction] from public view" (internal quotation marks omitted)); *Hickerson v. United States*, 287 A.3d 237, 243 (D.C. 2023) ("A set-aside, unlike the reversal or vacatur of a conviction, does not alter the fact of conviction." (internal quotation marks omitted)).[6] For example, a conviction that has been "set aside" under the YRA may

---

this case—is advisable, as judgment and commitment orders are broadly recognized as final orders in criminal cases. *See, e.g.*, *Butler v. United States*, 379 A.2d 948, 949 (D.C. 1977) ("Final judgment in a criminal case means [a] sentence."); Super. Ct. Crim. R. 32(f) (explaining that, in a judgment of conviction, the court "set[s] forth the plea, the jury verdict or the court's findings, the adjudication, and the sentence").

[6] The government quotes this language from *Hickerson* in support of its argument that the March 2023 judgment and commitment order is not a new order from which G.W. can appeal. *Hickerson*, however, does not support the government's argument; it merely clarifies that a YRA set-aside is premised on the fact of a continuing conviction.

still form the basis for a sentencing enhancement following a second or subsequent offense or be used for impeachment if the YRA recipient testifies in their own defense or serves as a character witness for another. D.C. Code § 24-906(f)(1), (4), (5); *see also Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) (explaining that the "YRA is properly understood to authorize the use of set-aside convictions in determining the appropriate sentence to be imposed in the event a defendant is subsequently found guilty of an additional crime"). A person who receives a set-aside conviction also may not seal the fact of their arrest under D.C. Code § 16-803(a), which allows record sealing upon a demonstration of actual innocence.

Thus, the disposition of a YRA set-aside, which, again, is founded on an adjudication of guilt and the imposition of a sentence, still aggrieves the recipient for standing purposes.[7] *In re C.T.*, 724 A.2d 590, 595 (D.C. 1999) (explaining a

---

[7] Notably, the government disavows a challenge to this appeal on the adjacent ground of mootness—i.e., the proposition that relief is "impossible or unnecessary," *Classic CAB v. D.C. Dep't of For-Hire Vehicles*, 244 A.3d 703, 705 (D.C. 2021)—asserting that mootness is "beside the point." Even so, we acknowledge and distinguish our decision in *Wilson v. United States*, 592 A.2d 480, 481 (D.C. 1991), in which we dismissed appellant's direct appeal of his conviction following a YRA set-aside as moot. In *Wilson*, the appellant was seeking to appeal from a superseded judgment and conviction order—in fact, we had already issued an opinion in that appeal when we learned that the trial court had purported to set aside appellant's conviction while this court had jurisdiction and we then remanded the case with

person is "aggrieved" by an order or judgment, and has standing to bring an appeal under D.C. Code § 11-721(b), if the order leads to "an infringement or denial of [their] legal rights"). In this way, an amended judgment and commitment order memorializing such a set-aside is no different than one that documents the adjudication of guilt and memorializes a sentencing reduction. *See, e.g.*, *Bell*, 676 A.2d at 42; *Long*, 163 A.3d at 785, 788 n.22 (explaining that a judgment and commitment order reflecting a resentencing constitutes a "new judgment" because it "reinstate[s] the conviction and the modified sentence"). Moreover, G.W.'s receipt of a judgment and commitment order noting and reaffirming the YRA set-aside was unquestionably a new order. The trial court did not have authority to issue this order until this court remanded the case, *see Wilson*, 592 A.2d at 481, and, while still keeping in place his prior adjudication of guilt and sentencing, the YRA set-aside granted G.W. new partial relief by shielding his conviction from public view.

To hold that a YRA-eligible youth offender is not aggrieved by the new judgment and commitment order granting them this disposition so as to allow them to file an appeal would present YRA-eligible youth offenders with a Hobson's choice. They would have to elect either to (1) pursue an appeal which might result

---

instructions to the trial court to reenter its earlier, invalid order, *id.* at 480-81. But, unlike G.W., the appellant in *Wilson* never filed a new appeal from the order or judgment granting the YRA set-aside. *See id.*

in the reversal if not vacatur of their conviction and delay obtaining lesser relief under the YRA or (2) forgo or abandon a direct appeal in order to seek relief under the YRA. But we see no indication in the text or the legislative history of the YRA that the Council meant to put youth offenders in such a disadvantageous position. The Council intended the YRA to "provide rehabilitation opportunities for deserving young adult[s]," Report on Bill 6-47, Youth Rehabilitation Act of 1985, before the Committee on the Judiciary, Council of the District of Columbia at 2 (June 19, 1985), and "the opportunity to start anew through expungement of his or her criminal record," *Holloway v. United States*, 951 A.2d 59, 64 (D.C. 2008) (citing Report on Bill 6-47 at 2); *see also Brown v. United States*, 579 A.2d 1158, 1161 (D.C. 1990) (explaining that the YRA's set-aside mechanism "affords a second opportunity . . . to a youthful offender to avoid a lifelong stigma of a criminal conviction"). The Council in no way suggested that the price to access these special rehabilitative opportunities was abandonment of the opportunity for an individual to challenge the legal and factual adjudication of their case.[8] And we strongly reject

---

[8] The government suggests that if G.W. wanted to seek review of his conviction following the set-aside order, he should have filed a motion to recall the mandate in the 2019 appeal under D.C. App. R. 41(f). But recalling the 2019 mandate would have undermined the status of the trial court's intervening 2023 set-aside order and amended judgment and commitment order, which was the very reason for this court's 2020 case remand.

the proposition that giving YRA offenders access to full appellate review as well as the opportunity to shield the fact of their conviction from much of the world allows them to, in the words of the government, "have [their] cake and eat it too."

This is not to say that a YRA-eligible youth may relitigate in a second direct appeal issues this court addressed on the merits, or could have addressed on the merits had they not been forfeited, in a first direct appeal. *See New York Life Ins. Co. v. Taylor*, 158 F.2d 328, 329 (D.C. Cir. 1946) (reaffirming the "well established rule that what is decided on an appeal cannot be examined on a second appeal brought in the same suit"); *see also Parker v. United States*, 254 A.3d 1138, 1142-43 (D.C. 2021) (explaining that this court will "excuse a returning appellant's failure to have raised a claim in an initial appeal . . . 'only in exceptional circumstances, where injustice might otherwise result'") (quoting *United States v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007)). But we understand that barrier to be a product of the "law of the case" doctrine—not a lack of standing. *See Jung v. George Washington Univ.*, 875 A.2d 95, 102 (D.C. 2005), *opinion amended on reh'g*, 883 A.2d 104 (D.C. 2005) ("The law of the case doctrine [generally] prevents relitigation of the same issue in the same case by courts of coordinate jurisdiction."); *Lenkin Co. Mgmt., Inc. v. D.C. Rental Hous. Comm'n*, 677 A.2d 46, 48 (D.C. 1996) (the law of the case doctrine generally "precludes reopening questions resolved by an earlier appeal in the same case"); *New York Life Ins. Co.*, 158 F.2d at 329 (explaining that the decision

in a first appeal generally "become[s] the settled law of the case" as to any subsequent appeal). And it has no application here, where G.W. has never presented (or forfeited) any substantive claims to this court, much less obtained our review on their merits, because we granted his motion to remand to allow the trial court to give him a YRA set-aside before his first appeal was even briefed. *See, e.g.*, *Bell*, 676 A.2d at 39 & n.3, 42 (where the appellant moved to remand the case for resentencing before briefing, holding that the appellant could appeal from a resentencing order issued after the receipt of the mandate in the first appeal and considering his challenges to his convictions on the merits); *cf. Kleinbart v. United States*, 604 A.2d 861, 867-68 (D.C. 1992) (declining to deem a prior order denying summary reversal law of the case).

For these reasons, we conclude that individuals like G.W. who are eligible for a set-aside under the YRA while their direct appeal is pending may continue to seek review of their underlying adjudication by requesting a remand under D.C. App. R. 4(e) and filing a new appeal following the remand under D.C. App. R. 41(e). Because G.W. followed this procedure, his appeal is properly before this court.

## II.    Elements of Simple Assault

Turning to the merits, G.W. argues that this court must vacate and remand his conviction for simple assault because the trial court did not make findings on the

elements of an offensive touching assault as defined by the en banc court in *Perez Hernandez*, 286 A.3d at 1004, after G.W. was found guilty. We agree and remand G.W.'s case to allow the trial court to make the requisite findings.

## A.  Additional Background

G.W. pleaded not guilty to the charge of simple assault and had a bench trial in 2019 before the Honorable Judith Bartnoff. At trial, the government relied on video footage from the Anacostia Metro Station which showed the lead up to and the aftermath of the alleged assault, but not the incident itself because the view from the surveillance cameras was obstructed. The government also relied on testimony from two MTPD officers: Officer Keithon Williams, whom G.W. had allegedly assaulted, and Officer Michael Boadu, who was involved in G.W.'s arrest.

Officer Williams testified that on January 5, 2019, he was on duty at the Anacostia Metro Station when he saw G.W. push through the fare gate without paying the fare. Officer Williams followed G.W. out of the station and grabbed G.W.'s backpack from behind, in an attempt to get G.W.'s attention and issue him a citation, at which point G.W. sought to back away. According to Officer Williams, he and G.W. "talked for a few seconds" during which Officer Williams asked G.W. for identification and his SmarTrip card. G.W. refused to present either. Officer Williams testified that G.W. instead "grabbed the lapel" of

Officer Williams's jacket and the two "start[ed] to struggle." Officer Williams believed G.W.'s actions created a "safety issue." He told G.W. to let go of his jacket but G.W. would not.[9] Six other officers on the scene then intervened, wrestled G.W. to the ground, handcuffed him, took him back inside the station, and searched him.[10] After officers handcuffed and searched G.W., Officer Williams noticed that G.W. had an abrasion above his eye and his lip was cut. Officer Williams and another officer took G.W. to the hospital for medical care.

Officer Boadu also testified to having seen G.W. push through the fare gates without paying. Like Officer Williams, Officer Boadu followed G.W. out of the station to issue him a citation or "check his fare gate card." Officer Boadu witnessed

---

[9] On cross-examination, Officer Williams acknowledged that he had not been injured during this interaction but asserted that G.W. "damage[d] [his] jacket" by ripping the lapel. He acknowledged, however, that he had not mentioned this damage in any of the reports he filed about the alleged assault. Following his testimony, the government did not produce the jacket pursuant to Super. Ct. Crim. R. 16 or ask for additional time to locate it. G.W., meanwhile, emphasized to the court that "[t]he government hasn't brought you the jacket," and "also hasn't brought you any pictures or photographs of the ripped lapel on the jacket," but did not object under Super. Ct. Crim. R. 16 that the government had violated its discovery obligations.

[10] Officer Williams's testimony describing officers handcuffing G.W. after he was on the ground conflicted somewhat with Officer Boadu's testimony, in which he described officers pushing G.W. against a wall to handcuff him. *See infra.* The video exhibits submitted by the government introduce another factual wrinkle; they appear to show officers using force against G.W. to bring him to the ground twice: once when they piled on top of him outside the station and then again when they brought G.W. to the ground after they brought him back inside the station.

Officer Williams grab G.W.'s backpack, heard G.W. refuse to present his fare gate card or identification, and saw G.W. "grab[] on to Officer K. Williams'[s] coat." When G.W. refused to let go, Officer Boadu testified that he "tried to grab [G.W.] by his left arm" and "ended up pushing [G.W.] up against the wall" to restrain him.

During closing, the government argued that simple assault requires: (1) "[t]hat the defendant, with force or violence, injured or attempted to injure Officer Williams"; (2) "that the defendant intended to use force or violence against Officer Williams"; and (3) "at the time the defendant had the apparent ability to injure [Officer Williams]." But the court did not apply this legal framework in rendering its verdict; indeed, the court said nothing about the elements of the charged offense. Instead, after generally crediting the police officers' testimony, the court found that G.W. had "grabbed Officer Williams's jacket" and that that act was "sufficient" to convict G.W. of simple assault. The court then sentenced G.W. under the YRA to thirty days' incarceration, suspended as to all but time served, and placed G.W. on six months' supervised probation.

### B.     Standard of Review

Effectively acknowledging that he was convicted of simple assault under an offensive touching theory as defined by this court sitting en banc in *Perez Hernandez,* G.W. argues that this court must reverse and remand his conviction

because the trial court did not make findings regarding two of the five requisite elements of this theory of simple assault. *See* 286 A.3d at 1004 (explaining that to prove a defendant's guilt of an offensive touching assault, "[t]he government must prove that the defendant (1) touched another; (2) that he did so purposely, not by accident; (3) that the touching offended the other person; (4) that the touching would offend a person's reasonable sense of personal dignity; and (5) that the defendant either acted with the purpose of causing offense *or* acted knowing that the touching would cause offense." (footnotes omitted)). Specifically, G.W. notes the absence of any finding that "the touching would offend a person's reasonable sense of personal dignity" and that "the defendant either acted with the purpose of causing offense or acted knowing that the touching would cause offense." The government claims that G.W.'s elements challenge is unpreserved, and that we may review his claim only for plain error. We conclude instead that G.W. adequately preserved his challenge to the trial court's application of the elements of assault by pleading not guilty.

"[I]t is well settled in this jurisdiction that a full range of challenges to the sufficiency of the evidence are automatically preserved at a bench trial by a defendant's plea of not guilty." *Carrell v. United States*, 165 A.3d 314, 326 (D.C. 2017) (en banc) (internal quotation marks omitted). This automatic preservation rule extends beyond straight-forward sufficiency-of-the-evidence challenges and also preserves claims that the trial court failed to make findings on all the requisite

elements of an offense, for those arguments are subset of such challenges. *Id.* A plea of not guilty at a bench trial will thus preserve a defendant's challenge to the elements of an offense on appeal. *Id.*

The government argues, however, that because G.W conceded in his briefing to this court that the evidence "would permit . . . a reasonable trier of fact to find the elements of simple assault beyond reasonable doubt," his elements challenge is no longer automatically preserved by virtue of his plea of not guilty. Rather, the government claims G.W.'s elements argument is analogous to an unpreserved "claim of instructional error." We disagree.[11] The government's argument confuses preservation with abandonment. Preservation takes place in the trial court and is the mechanism by which the trial court is put "on notice that [the party's] position on the correct rule of law differ[s] from the court's." *Brown v. United States*, 313 A.3d 555, 564 (D.C. 2024). As noted, at a bench trial a defendant's not guilty plea does the work of alerting the trial court of the defendant's view that they should not be

---

[11] At oral argument, G.W. sought to withdraw his concession as to the sufficiency of the evidence. We need not resolve whether he could properly withdraw this concession at oral argument because, even if such a withdrawal were permissible, G.W. never developed an argument that the evidence was insufficient beyond purporting to withdraw his concession, and, therefore, abandoned any broader sufficiency-of-the evidence challenge. *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (explaining that a litigant abandons "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation").

convicted either based on the evidence presented or under the legal framework employed. *See Carrell*, 165 A.3d at 326. When, on appeal, a defendant who pled not guilty and had a bench trial abandons their preserved sufficiency-of-the-evidence challenge, that litigation choice does not undo what transpired in the trial court and "un-preserve" for the purposes of our review their accompanying preserved challenge to the framework within which those facts are assessed. *See Comford v. United States*, 947 A.2d 1181, 1188-89 (D.C. 2008) (explaining that a litigant abandons an argument by not properly raising or developing it on appeal whereas they fail to preserve an argument by not raising it before the trial court).

Nor is the government correct that we should view G.W.'s elements claim as analogous to a forfeited instructional error during a jury trial. As the government points out, we have consistently held that a defendant who fails to object to a jury instruction under Super. Ct. Crim. R. 30(d) is entitled only to plain error review. *See, e.g.*, *Buskey v. United States*, 148 A.3d 1193, 1204-05 (D.C. 2016); *Mobley v. United States*, 101 A.3d 406, 421-22 (D.C. 2014); *Wheeler v. United States*, 930 A.2d 232, 241 (D.C. 2007). But Rule 30, by its terms, applies only to jury trials. *See* Super. Ct. Crim. R. 30 (setting forth that a "party may request in writing that the court instruct the jury on the law as specified in the request" and explaining that if a party fails to object to an instruction "before the jury retires to deliberate," any claim of error may only be reviewed for plain error on appeal). In the context of a bench

trial, we have been clear that a plea of not guilty will preserve a defendant's "challenge[] to the requisite elements of the crime." *Carrell*, 165 A.3d at 326.[12] Because G.W. pleaded not guilty, we review his challenge to the elements of simple assault de novo. *See Sutton v. United States*, 988 A.2d 478, 482 (D.C. 2010) (explaining that "[t]his court . . . reviews de novo the elements of the crime which the prosecution must prove").

## C. Analysis

In *Perez Hernandez*, this court, sitting en banc, addressed "whether a nonviolent offensive touching, not of a sexual nature" may constitute an attempted battery assault and, if so, what the elements of that offense are. 286 A.3d at 996, 998-99. We observed that criminal assaults generally fall into "two distinct categories: attempted battery assaults and intent-to-frighten assaults." *Id.* at 998 (internal quotation marks omitted). Attempted battery assault, we determined, includes assault based on a nonsexual offensive touching. *Id.* Turning to the proper elements of a nonsexual offensive touching assault, we recognized that, while we had "historically . . . categorized an attempted battery (or completed battery) assault

---

[12] The government also cites to the Ninth Circuit's decision in *United States v. Johnson*, 979 F.3d 632, 636 (9th Cir. 2020) to argue that a trial court's "legal error regarding the elements of the offense is reviewed in the same way we review an erroneous jury instruction regarding the elements of the offense." *Johnson*, however, is in tension with *Carrell*—by which we are bound.

as a 'general intent' crime," an offensive touching assault "cannot be inadvertent." *Id.* at 1000-01. We thus sought to define with more particularity when a touching is offensive and what mens rea is required for an offensive touching to rise to the level of an assault. *Id.* at 1000-02. We concluded in that case that "the government [had to] prove that the defendant (1) touched another; (2) that he did so purposely, not by accident; (3) that the touching offended the other person; (4) that the touching would offend a person's reasonable sense of personal dignity; and (5) that the defendant either acted with the purpose of causing offense *or* acted knowing that the touching would cause offense." *Id.* at 1004; *but see also id.* at 1003 (leaving open whether purpose to offend or knowledge of the offensiveness of the act was required or whether recklessness could suffice as the mens rea for this element of an offensive touching assault).

Although *Perez Hernandez* clarified that an intentional, nonsexual offensive touching may constitute an assault, it left undefined exactly what conduct may be categorized as an offensive touching assault—which is no longer a "'general intent' crime," *id.* at 1000, 1002—and what conduct falls under the broader umbrella of attempted or completed battery assault—for which we have yet to assign a specific mens rea using modern terminology. *But see Carrell*, 165 A.3d at 323-24 (endorsing the more precise gradations of mens rea in the Model Penal Code—purpose, knowledge, recklessness, and negligence—in lieu of vague and confusing terms like

"general" and "specific" intent). For example, it remained unclear after *Perez Hernandez* whether an offensive touching assault included actions "performed with minimal force," actions that are "nonviolent," actions that "caus[e] or threaten[] no actual physical harm to the victim," or actions that are a crime simply because of the "offensive nature of the touch." *Smith v. United States*, 306 A.3d 67, 77 (D.C. 2023) (internal quotation marks omitted).

In *Smith*, we clarified that nonsexual offensive touching assault (1) encompasses scenarios where "defendant's conduct caused no physical damage to the complainants' bodies, so that the conduct would constitute criminal assault solely by virtue of the offensive nature of the touching," 306 A.3d at 77, and (2) must be based on an intentional touch, *id*. at 77-79. (We also acknowledged the continued uncertainty "whether it would suffice that the defendant was reckless as to whether the conduct would be offensive" and then set that question aside. *Id*.)

With nonsexual offensive touching assault delineated as such, the conduct that the government charged G.W. with falls into this category of assault. The basis for G.W.'s simple assault charge was that he had grabbed Officer Williams's jacket. The government did not contend that G.W. committed an "intent to frighten assault," nor did it contend that G.W. had caused any "bodily damage" to Officer Williams. *See Smith*, 306 A.3d at 76. Based on its recitation of the elements of simple assault,

we assume the government sought to prove that G.W., "with force or violence, [had] *attempted* to injure Officer Williams," (emphasis added), another viable theory of the inchoate crime of assault. *Perez Hernandez*, 286 A.3d at 999 (explaining an assault can encompass "not just an attempted battery but [also] a completed battery"). But the jacket grab,[13] when examined in context, did not prove beyond a reasonable doubt that G.W. assaulted Officer Williams by attempting to injure him, as the trial court seemingly recognized. Officer Williams testified there was a "struggle"—but the nature of the struggle was unclear, he provided no testimony that G.W. took any action to hurt him, and he only vaguely testified that G.W.'s actions created "a safety issue," without specifying how that was the case. G.W.'s alleged conduct could therefore only constitute an assault "by virtue of the offensive nature of the touching." *Smith*, 306 A.3d at 77. Accordingly, for the court to find G.W. guilty, it had to conclude that each of the elements outlined in *Perez Hernandez* was satisfied. *See* 286 A.3d 1004.

The trial court did not apply those elements. Deciding this case without the benefit of our decision in *Perez Hernandez*, the trial court understood the issue to be

---

[13] The government contended that G.W. had ripped the jacket but, as it had failed to preserve the jacket and allow the defense to view it pursuant to Super. Ct. Crim. R. 16, it argued that the rip was "beside the point. The point is [G.W.] grabbed ahold . . . of the officer's jacket."

"did [G.W.] put his hands on Officer Williams' jacket?" and, "believe[ing] that the government ha[d] proven he did . . . for that reason [found G.W.] guilty of simple assault." The trial court thus did not, as G.W. argues, consider whether the touch would offend a reasonable person's sense of dignity or whether G.W. acted purposefully or knowingly to cause offense. (As noted above, we have yet to resolve whether a defendant could cause offense recklessly, but the government has not argued in this case that we should and has not challenged G.W.'s assertion that a showing of purpose or knowledge as to this element is required. Accordingly, we consider that argument forfeited in this case.)

Having concluded that the trial court erred in applying the elements of an offensive touching assault, we must consider whether the error was harmless under the standard for constitutional error first set forth in *Chapman v. California*, 386 U.S. 18 (1967). A constitutional error "is considered harmless if the government can 'show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Carrell*, 165 A.3d at 328 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). Considering whether a court's error as to the elements of an offense was harmless is "distinct from an assessment that the evidence was legally sufficient." *Id.* at 328 n.35. The "pertinent question" is not whether there was sufficient evidence to sustain the verdict, but "whether we can say, beyond a reasonable doubt, that the trial court would have issued a guilty verdict in this case"

based on an assessment of the proper elements. *Id.* at 328. We may only affirm a verdict after a bench trial where the court makes the factual findings "it would have made had it correctly applied the law."[14] *Id.*; *see also id.* at 329 (explaining that "[t]he bottom line is that '[a]s an appellate court, we do not make findings of fact and therefore may not rule on our own reading of the evidence unaided by the trial court's findings'") (quoting *Lihlakha v. United States*, 89 A.3d 479, 490 (D.C. 2014)).

Here, the court did not incidentally make the factual findings that would have been necessary had it assessed G.W.'s guilt under *Perez Hernandez*. It did not find that a reasonable person would have perceived G.W.'s jacket grab to be offensive under these circumstances, and it did not find that G.W.'s act of grabbing Officer Williams's jacket could only have been conducted with the purpose or knowledge of causing Officer Williams offense. *See Perez Hernandez*, 286 A.3d at

---

[14] As we explained in *Carrell*, our application of harmless error analysis in the context of a bench trial differs from our analysis in the context of a jury verdict. 165 A.3d at 329 n.38. In reviewing a jury verdict, we "do not know how the jury viewed the evidence," and thus we "affirm the conviction if we think 'that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 17 (1999)). "By contrast, in a bench trial, we often *know* the inferences the factfinder made and declined to make," making remand the appropriate course of action. *Id.*

1004. Accordingly, we cannot say that the court's application of the incorrect legal framework was harmless and we must remand this case to the trial court. *Howard v. United States*, 966 A.2d 854, 857 (D.C. 2009); *see also Perez Hernandez*, 286 A.3d at 1004 (remanding for assessment of guilt under the correct legal standard); *Carrell*, 165 A.3d at 330 (explaining that in circumstances such as those in this case, a "remand is an accepted course of action").[15]

### III. Conclusion

For the foregoing reasons, we vacate the judgment and remand the case for the trial court to make the necessary findings regarding G.W.'s mens rea and the nature of the touch and consider G.W.'s Rule 16 claim.

*So ordered.*

---

[15] Because G.W. abandoned his sufficiency-of-the-evidence challenge on appeal, *see supra* note 11, the Double Jeopardy clause does not bar retrial. *See Smith v. United States*, 175 A.3d 623, 627 (D.C. 2017) (explaining that when reversal is based on the sufficiency of the evidence, retrial is barred on Double Jeopardy grounds).